```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


     IN RE:                       )  CA No. 01-12257-PBS
                                  )  CA No. 05-11084-PBS
     PHARMACEUTICAL INDUSTRY AVERAGE )  CA No. 06-11337-PBS
     WHOLESALE PRICE LITIGATION    )  CA No. 07-10248-PBS
                                  )  Pages 1 - 66




                            STATUS HEARING

                 BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE






                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         May 28, 2009, 2:15 p.m.






                          LEE A. MARZILLI
                        OFFICIAL COURT REPORTER
                     United States District Court
                     1 Courthouse Way, Room 3205
                         Boston, MA  02210
                          (617)345-6787
```

72fe4b07-ff68-4ab0-9daf-1849027a1147

1   A P P E A R A N C E S:

2

3        EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
     LLP, One Main Street, Cambridge, Massachusetts, 02142,
     for the Class Plaintiffs.
4

5        JOHN A. MACORETTA, ESQ., Spector Roseman Kodroff &
     Wills, 1818 Market Street, Suite 2500, Philadelphia,
     Pennsylvania, 19103, for the Class Plaintiffs.
6

7        JOHN T. MONTGOMERY, ESQ. and JOHN P. BUEKER, ESQ.,
     Ropes & Gray, LLP, One International Place, Boston,
     Massachusetts, 02110, for Schering and Warrick.
8

9        FREDERICK G. HEROLD, ESQ., Dechert, LLP,
     2440 W. El Camino Real, Suite 700, Mountain View,
     California, 94040-1499, for Glaxosmithkline.
10

11        PAUL K. DUEFFERT, ESQ., Williams & Connolly, LLP,
     725 Twelfth Street, N.W., Washington, D.C., 20005,
     for Par Pharmaceutical Companies, Inc.
12

13   ALSO PARTICIPATING:

14        NICHOLAS N. PAUL, ESQ., State of California.
          DONALD E. HAVILAND, ESQ., for Plaintiff.
15        D. SCOTT WISE, ESQ., AstraZeneca Pharmaceuticalls LP.
          LYNDON M. TRETTER, ESQ., Bristol-Myers Squibb Company.
16        STEVEN F. BARLEY, ESQ., Amgen, Inc.
          ANDREW D. SHAU, ESQ., Johnson & Johnson.
17        GEORGE B. HENDERSON, AUSA, United States of America.
          JOANNE M. CICALA, ESQ., New York City, New York Counties.
18        SUSAN SCHNEIDER THOMAS, ESQ., Ven-A-Care.
          WILLIAM A. ESCOBAR, ESQ., Dey and Mylan.
19        PETER A. MULLIN, ESQ., Commonwealth of Massachusetts.
          MERLE M. DELANCEY, JR., ESQ., Baxter Healthcare.
20        CLINTON C. CARTER, ESQ., South Carolina and Utah.
          JAMES W. MATTHEWS, ESQ., Watson Pharmaceuticals.
21

22

23

24

25

72fe4b07-ff68-4ab0-9daf-1849027a1147

1            P R O C E E D I N G S

2            THE CLERK:  In Re:  Pharmaceutical Industry

3    Average Wholesale Price Litigation, Civil Action 01-12257,

4    will now be heard before this Court.  Will counsel please

5    identify themselves for the record.

6            MR. MACORETTA:  Good afternoon, your Honor.  John

7    Macoretta from Spector Roseman Kodroff & Wills for the class

8    plaintiffs.

9            MR. NOTARGIACOMO:  Ed Notargiacomo from Hagens

10   Berman Sobol Shapiro for the class plaintiffs as well as for

11   the states of Arizona, Montana, and Nevada.

12           MR. MONTGOMERY:  John Montgomery from Ropes & Gray

13   for Schering and Warrick, your Honor.

14           MR. BUEKER:  Good afternoon, your Honor.  John

15   Bueker, also from Ropes & Gray, for Schering and Warrick.

16           MR. HEROLD:  Good afternoon, your Honor.  Fred

17   Herold, Dechert, for GSK.

18           MR. DUEFFERT:  Good afternoon, your Honor.  Paul

19   Dueffert, Williams & Connolly, for Par Pharmaceutical, Inc.

20           THE COURT:  I recognize a lot of people sitting

21   back there.  I'm not sure it's necessary for everyone to

22   introduce themselves, although I will encourage

23   participation.  My goal in doing this is twofold:  One is

24   just to get a handle on all the different cases that have

25   made up the AWP MDL.  It's now been eight years, going on

1    nine years since I got the first case, and I want to

2    understand where each case is going and what the end point

3    is.

4           The second is -- many of you know this -- I had

5    breakfast with Eric Green, the mediator who's helped many

6    people mediate this case, maybe two weeks ago.  He had a

7    proposal for a universal mediation process, which would

8    involve not just the various companies involved but also the

9    federal and state governments, and, of course, plaintiffs'

10   class counsel and the various Attorney Generals offices, to

11   essentially take what we've learned over the last eight

12   years and try and create certain general guidelines on how

13   to deal with the federal-state issue, how to deal with

14   damage methodologies, how to deal with generics, basically

15   trying to figure out if there's a way of having a universal

16   settlement of this.

17          I don't know which order we should go on.  Perhaps

18   I could start with where each case is going, and then

19   hear -- I see some folks whom I think are representing --

20   which Attorney Generals are represented here?  First of all,

21   where's the federal government?  There you are standing up

22   there.  All right, great.  Now.  Who's here from -- could

23   you stand -- from the various state Attorney Generals?

24   You're representing --

25          MR. NOTARGIACOMO:  Montana, Nevada, and Arizona.

1          THE COURT:  You're with New York counties, right?

2          MS. CICALA:  And also Iowa.

3          THE COURT:  Iowa.

4          MR. PAUL:  California, your Honor.

5          THE COURT:  Okay.

6          MR. CARTER:  South Carolina and Utah.

7          THE COURT:  Okay, thank you very much.  And I know

8    we have a lot of the -- we have the plaintiffs' class

9    lawyers.  And I'm reluctant to have us go through every

10   single corporate defendant, but I do want to make sure that

11   I hear your views about especially the universal, the

12   proposal.

13          I just got off the phone, I called him, and I

14   said, "Well, actually, how soon were you thinking of this,

15   Professor Green?" who was in heated mediation on something

16   completely different, and he was actually thinking as soon

17   as the end of June.  It's a lot of people to pull in.  He

18   already has told me that his availability is June 26 or

19   June 27.  I am sure he could make available other dates.  I

20   could try and make available downstairs the jury lounge

21   area.  If that's too public, maybe someone has a law firm

22   that could actually house a fair number of people with

23   breakout rooms.

24          He says he's done one of these before, and there

25   are certain prototypes for doing this.  I myself, I have to

1    admit, am not really sure what it would involve.  He said

2    many of you would, and many of you have expressed privately

3    support to him for doing it.

4            The one last thing I wanted to mention is, he's

5    asked me to get involved in the mediation.  It's something I

6    have not done so far in this case.  I've done it in other

7    cases.  I haven't.  I've got a lot of outstanding motions on

8    important legal issues, not the least of which is FULs and

9    what to do with them and the like.  So I don't know if you

10   want me involved, and I want you all to be thinking about

11   that.  I'm going to start off just by getting a blow-by-blow

12   about where each case is and when do you think it will be

13   over; and then if there are any next events that I should be

14   scheduling, am I missing something?  I saw one whole case I

15   didn't even know I had, nothing's happened in, when we were

16   trying to get prepared for this.

17           So maybe we can just start with the plaintiffs'

18   attorneys.  I'm hoping you're somewhat prepared to do this

19   on the class cases.  I know some are on appeal, and there's

20   nothing we can or should do about those, but there are other

21   cases where, for example, GSK which aren't even complete

22   yet.  So is somebody here from GSK?

23           MR. HEROLD:  Yes, your Honor.

24           THE COURT:  Yes, you are, right.  Okay, so I know

25   you're here in another capacity somewhat, but with the

1 settled class, maybe we can just go down each one and where

2 we are on it.

3 　　　　MR. MACORETTA:  Sure.  We submitted a filing the

4 other day on this, your Honor.

5 　　　　THE COURT:  The status reports, yes, I've got the

6 pile of them here.

7 　　　　MR. MACORETTA:  So the good news to start with is

8 that checks to consumers in the GSK settlement should go out

9 this week.

10 　　　　THE COURT:  And so what percentage -- I want to

11 learn from GSK.  It's amazing to me that a check hasn't gone

12 out yet because it was the first one in the door settled.

13 So the checks are going out this week.  How much is going

14 out the door to consumers?

15 　　　　MR. MACORETTA:  About $1.6 million.

16 　　　　THE COURT:  And what percentage of the class do we

17 think has put in for it, the consumer class?

18 　　　　MR. MACORETTA:  I don't have an overall

19 percentage, Judge.  This was our earliest process when we

20 didn't have as good CMS data and we can't track.  I can get

21 you a percentage, but --

22 　　　　THE COURT:  I'd love a report at the end of the

23 day because I'd like to learn from it.  Did people have

24 to -- I don't remember, what kind of claims did they have to

25 put in in GSK?

1          MR. MACORETTA:  They got the -- if you'll

2     remember, there were the two chemotherapy drugs, Kytril and

3     Zofran, which were Medicaid paid, and then there were a

4     bunch of other drug that were paid at a much lower level.

5     So people got a claim form with blocks for those seven or

6     eight drugs, "Tell us how much you paid for each one," and

7     then you got a different percentage.  You got 100 percent,

8     50 percent --

9          THE COURT:  So we didn't have CMS telling us what

10    they paid.  They actually had to go out, do research, file

11    an affidavit.  And how many consumers do we know who even

12    put in a claim?  Do we know?

13         MR. NOTARGIACOMO:  There are a total of just under

14    14,000 claims filed.

15         THE COURT:  14,000?  And you don't know what we

16    were expecting?

17         MR. NOTARGIACOMO:  I can tell you that by way of

18    number of letters that went out.  There were almost two

19    million letters that went out using the CMS data.

20         THE COURT:  And were those overinclusive?

21    Remember, there was some criticism that they may have been

22    overinclusive?  Or do we think that was who took it?

23         MR. NOTARGIACOMO:  Those were overinclusive

24    because we don't know from the CMS data whether or not the

25    consumer actually paid out of pocket, so many of the people

1  may not have been class members because they had

2  supplemental insurance.

3           THE COURT:  I see.  All right, so, now, what's

4  going on with the third-party payors?

5           MR. MACORETTA:  The claims are being processed.

6  They're still auditing data and going through that to make a

7  determination, make their final determination of what the

8  pro rata percentage --

9           THE COURT:  When is the projected date?

10          MR. NOTARGIACOMO:  That's a few months, at least,

11 Judge, is the answer we've gotten from the claims

12 administrator.

13          THE COURT:  So the checks will go out --

14          MR. MACORETTA:  At least no sooner than a few

15 months from now is the answer we have from the claims

16 agency.  We just don't have a more definitive answer than

17 that.  That is way overallocated.  I think there's well over

18 a billion dollars in claims from the TPPs, so that will

19 be --

20          THE COURT:  And how much, what's the pot again, do

21 you remember?

22          MR. MACORETTA:  The TPP pot will be about 50,

23 40 something million dollars, Judge, before you take out

24 attorneys' fees, so it's less than that.

25          THE COURT:  Have you been paid any attorneys' fees

1    from the settlement yet?

2                MR. MACORETTA:  Yes.

3                THE COURT:  How much have you all been paid in

4    attorneys' fees for this settlement?

5                MR. MACORETTA:  You gave us 25 percent of

6    $65 million, I think, so it was about -- what's that?

7    25 percent of $67.5 million, so that's about $16 million.

8                THE COURT:  All right, and you've pocketed that.

9    In other words, you have that in --

10               MR. NOTARGIACOMO:  You gave us 30 percent, your

11   Honor.

12               MR. MACORETTA:  I'm sorry.  That included

13   expenses, but, yes, we have that.  We've pocketed that, yes.

14               THE COURT:  All right.  So on the cy pres fund,

15   that only comes out of the consumers, we think.  Is that

16   right?

17               MR. MACORETTA:  Here's the issue with the cy pres.

18   Yes, yes, the TPPs will use up all their money, so there

19   will be no money left over from them, for sure.  The

20   consumer cy pres is scheduled for mediation with Eric Green

21   June 22.  Under the settlement agreement, the leftover

22   consumer money is subject to a mediation between consumers,

23   Attorney Generals, and the TPPs.  All of us will get down

24   and meet and try to come up with some allocation that Eric

25   Green will mediate or determine, I think, ultimately and

1   then get your approval.

2           THE COURT:  How much money are we talking about?

3           MR. MACORETTA:  We're talking about $12 million?

4   It's a little less than $12 million.

5           THE COURT:  So it's huge, it's huge.

6           MR. MACORETTA:  Yes, it is.  I will tell you,

7   Judge, that part of our suggestion is going to be that some

8   of that money --

9           THE COURT:  Could we just plow it back in to these

10  people who have put in claims?

11          MR. MACORETTA:  Well, that's going to be some of

12  our suggestion, Judge, Yes.  Part of it, we're going to

13  suggest paying these consumers more.  Part of it is going to

14  be an attempt to find some of the consumers who for whatever

15  reason didn't respond to the first notice.  There's

16  deficient claims, there's a lot of deficient claims, and we

17  may suggest spending some money --

18          THE COURT:  Deficient because we think they might

19  be fraudulent, or the people couldn't come up with the

20  documentation?

21          MR. MACORETTA:  They couldn't come up with

22  anything.  And all of these people got letters from the

23  administrator, "Your claim is deficient, you didn't give us

24  any proof, you didn't give us an affidavit," so they just

25  ignored it.  So we want to use some of the money to reach

1    out to those people and --

2            THE COURT:  Did we pay these people -- see, I

3    don't remember, there are so many classes -- were we paying

4    the consumers treble?

5            MR. MACORETTA:  No.  Under the terms of the

6    settlement, consumers who took Kytril and Zofran were

7    getting 50 percent of their claimed amount, 50 percent of

8    what they paid.  Consumers who claimed for all of the other

9    drugs were getting 5 percent of what they paid for those

10   drugs with a $100 minimum.

11           THE COURT:  So one thing I'd like you -- cy pres

12   funds, you know, for me --

13           MR. MACORETTA:  We know.

14           THE COURT:  -- where usually there's a few

15   thousand left are over, just it wasn't worth the dime.  So

16   to the extent, are you going to be part of the negotiation

17   process for this?

18           MR. HEROLD:  We're not, your Honor.  We agreed to

19   stay out of the mediation.  From GSK's perspective, the

20   money is spent, and it has it divided up between the

21   consumers, third-party payors, and Attorneys General who had

22   filed claims under parens patriae here --

23           THE COURT:  So you're saying, are some of the

24   Attorney Generals wanting part of it?  Is that it?

25           MR. MACORETTA:  At the time the settlement was

1  reached, that was the terms of the settlement, the Attorney

2  Generals could be involved in this mediation to discuss it.

3  Now, will they want some of it?  I don't know.  I assume

4  they will, but we haven't talked to them about it yet.

5            THE COURT:  All right.  So my strong preference,

6  because I've already rejected one $12 million cy pres fund,

7  is whether it's finding new people who weren't able to put

8  in a claim or just paying more to the people who are class

9  members up to the trebling.  After that, you couldn't

10  justify it.

11            MR. MACORETTA:  And I should point out, Judge,

12  some of those people probably, to the extent people got a

13  $100 minimum, some of those people may have hit their

14  treble.  They may have had a $20 claim that we were paid up

15  to that minimum.

16            THE COURT:  Sure.  When there's something left

17  that's a true cy pres, you know, everybody's gotten the

18  maximum of what you could possibly argue in good faith,

19  then -- all right, so that's GSK.  What I'd love at the end

20  of it is a report.

21            MR. MACORETTA:  But you're going to have to sign

22  off on whatever we do, so, yes.

23            THE COURT:  So but in particular what I'm worried

24  about is -- this is the first of them.  I was very

25  appreciative that GSK came in the door and settled right

1  away.  Just what have we learned about what works in claims

2  handling, what percentage returns are we getting, did the

3  media work?  We went on the Internet, right?

4        MR. MACORETTA:  We have a Website, yes.  This is

5  the earliest one, so I don't know how aggressive we were on

6  the Internet beyond having a Website.

7        THE COURT:  It was one of the first in the

8  country, right, where we've tried to do Internet noticing?

9        MR. MACORETTA:  Yes.

10       THE COURT:  I want to know how it's worked, is it

11 worth it?  So just what's worked here.  Yes?

12       MR. HEROLD:  Your Honor, one other comment I make

13 is, we did do the very best we could to get notice out to

14 the entire class, especially the consumers.  And I don't

15 know if you recall, but we hired and split the cost for

16 Professor McGovern from Duke Law School --

17       THE COURT:  I remember that vividly, yes.

18       MR. HEROLD:  -- to come in and advise us, and he

19 suggested some improvements on the notice plan and the way

20 the settlement was administered.  So we've tried very hard

21 with the assistance of a law professor to design a program

22 that would get as much money as possible out of this

23 agreed-upon amount to the consumers.

24       THE COURT:  I agree with that, and so I think all

25 good faith and due diligence was performed her.  And yet it

1   was our earliest, and there's many that are flowing from it,

2   and we can learn.

3           MR. MACORETTA:  And before the mediation, we'll

4   submit to you the statistics we have and exactly what claims

5   so you can get a better handle.  That's GSK.

6           THE COURT:  Okay, good.  So basically when do you

7   anticipate you'll be able to give me a final wrap-up?

8           MR. MACORETTA:  The mediation is scheduled with

9   Professor Green on June 22.  Under the order, we mediate and

10  he rules.  It's more of an arbitration.

11          THE COURT:  No, but I'm talking the whole kit and

12  caboodle with the third-party payors, at least have one

13  piece of this done.  Do you think you could give me

14  something by September 1?

15          MR. MACORETTA:  We won't be in a position to tell

16  you, I don't think, by September 1 the checks can go out to

17  the TPP, quite candidly.

18          THE COURT:  Why don't you do this:  Why don't you

19  give me a status report on September 1.  And if the checks

20  haven't been paid by then, then at least you can tell me by

21  then when they will go out.  But at least the consumers will

22  go out by then, right?

23          MR. MACORETTA:  The consumers better go out this

24  week, yes.  It's what we understood from the administrator,

25  yes.

1          THE COURT:  Anybody else want to say anything else

2     about the GSK settlement?  Okay.

3          MR. MACORETTA:  Next on our list, Judge, is

4     AstraZeneca.

5          THE COURT:  All right.

6          MR. MACORETTA:  So AstraZeneca, the Class 1, which

7     is the Medicare Part B consumers, as your Honor knows, we

8     went around -- we think we finally have that resolved.  That

9     was the one that started out with this $12 million cy pres,

10    which you encouraged us to pare down, and we did.  So that

11    claim is being processed, and I don't think we have a date

12    from the administrator yet as to when those checks are going

13    to go out.

14         THE COURT:  It's on appeal, isn't it?

15         MR. MACORETTA:  I'm sorry, it's just out there and

16    there's an appeal of that, that's right.  That's right,

17    that's right.

18         THE COURT:  So where are you on that appeal

19    process?

20         MR. MACORETTA:  That has not yet -- I don't even

21    think there's a briefing schedule on that appeal yet.

22    Mr. Haviland is here.  I don't --

23         THE COURT:  Mr. Haviland, do you know when that

24    briefing is scheduled?

25         MR. HAVILAND:  We haven't got a briefing schedule,

72fe4b07-ff68-4ab0-9daf-1849027a1147

1   Judge.  We've been told one will be coming from the First

2   Circuit, but it hasn't been issued yet.

3           THE COURT:  Well, given the fact that I keep

4   reiterating this is a dying class, is there a way of filing

5   a motion for expedited review?

6           MR. MACORETTA:  We can do that, Judge.  We haven't

7   had success with that in the First Circuit in the past, but

8   we'll do it.  We can ask them for it and highlight that

9   fact.  This was an issue -- there was an appeal of the GSK

10  settlement where we raised this issue, and --

11          THE COURT:  Yes, but the GSK settlement you worked

12  out somehow, right?

13          MR. MACORETTA:  Yes, but I think we asked for

14  expedited review there, and nothing happened.  But we'll

15  file a motion for an expedited review.

16          THE COURT:  Mr. Haviland, do you agree that that

17  should be the case?

18          MR. HAVILAND:  Certainly, your Honor.

19          THE COURT:  So maybe if you did a joint motion.

20  Regardless of whether you prevail on your issues or he does

21  on his, it's a dying class of people who need the money.

22  They're sick and dying, so --

23          MR. HAVILAND:  From the voices of my clients,

24  they'd like it as well, Judge, so I'm happy to do that.

25          THE COURT:  Okay.  So there's nothing more for me

1   to do there, right?

2            MR. MACORETTA:  No.

3            THE COURT:  Okay.  Next one?

4            MR. MACORETTA:  The rest of AstraZeneca, Classes 2

5   and 3, are in the First Circuit as well, at least as to the

6   case you tried here in Massachusetts.  That's been fully

7   briefed and argued --

8            THE COURT:  And that's stayed.  There's nothing we

9   can do with that.  Have you argued that one yet?

10           MR. MACORETTA:  We have argued it, yes, several

11  months ago.

12           THE COURT:  For the class, not -- the Classes 2

13  and 3 you've argued?  Or you've just argued the big case?

14           MR. MACORETTA:  We've just argued what you ruled

15  on here, Judge, the trial, the results of the trial.

16           THE COURT:  Right, but what about the class cert?

17  That's on appeal too, right, that I granted cert?  It must

18  be.  I can't believe you missed an opportunity.

19           MR. WISE:  Your Honor, the cert issues bound up in

20  the Massachusetts trial are on appeal.

21           THE COURT:  Right.

22           MR. WISE:  The remaining cert issues you stayed

23  pending resolution of the First Circuit.

24           MR. MACORETTA:  There's no 23(f) because you never

25  gave a final ruling.

1          THE COURT:  Because I didn't even do it and stay

2     it, all right.

3          MR. WISE:  You decided to wait and see what the

4     Circuit did.

5          THE COURT:  Okay.  So that will be a huge thing

6     for me to do after the --

7          MR. MACORETTA:  First Circuit rules.

8          THE COURT:  -- the First Circuit rules, if it

9     doesn't sort of wipe out the core ruling.

10         MR. MACORETTA:  Yes.

11         THE COURT:  Okay.  So AstraZeneca, there's nothing

12    for me to do.

13         MR. MACORETTA:  No.

14         THE COURT:  That's a lovely thought, all right.

15         MR. MACORETTA:  BMS, there is also nothing for you

16    to do because, as we referenced, we have reached a global

17    settlement with BMS.

18         THE COURT:  All right, so, now, we've had a bad

19    experience in Track 2 because it's taken so long to get some

20    of the data to even be able to send out the notice.  So the

21    reason I wanted to find out is, where are we on the BMS

22    notice?

23         MR. NOTARGIACOMO:  What we did, anticipating there

24    might be a settlement with BMS, when we put in the request

25    for the Track 2 data, we also threw in the BMS drugs, so

1    that when we get that data, we will also get the BMS data

2    and won't have to wait for that.

3              THE COURT:  When do you want to schedule a

4    preliminary approval hearing?

5              MR. NOTARGIACOMO:  We're going to be filing

6    something on the Track 2 -- on BMS?

7              THE COURT:  Yes.

8              MR. NOTARGIACOMO:  There's an allocation meeting

9    between the consumers and the TPPs in BMS on June 22, and we

10   expect to file motions for preliminary approval in early

11   July.

12             THE COURT:  So shall we get that date on the

13   calendar?  Are there likely to be -- do you have class reps?

14             MR. MACORETTA:  We do, we do.

15             THE COURT:  And are you expecting -- I mean, the

16   number of objections, really, in both the McKesson and the

17   Track 2 started flowing in at the preliminary approval

18   stage, I believe, and --

19             MR. MACORETTA:  That's right.

20             THE COURT:  So are we expecting that you know of a

21   full-blown preliminary approval hearing that will take a lot

22   of time?

23             MR. MACORETTA:  It would be unusual if we didn't

24   have one in this case right, Judge?

25             THE COURT:  Well, I always have a preliminary

1   approval hearing.

2            MR. MACORETTA:  There's been objections to the

3   preliminary approval in AstraZeneca and GSK as well, I

4   think, so --

5            THE COURT:  For the last two.  So now that

6   everyone's here, let's set a date.  Robert, do we have an

7   afternoon?  Maybe the third week in July, does that sound

8   right?

9            MR. MACORETTA:  Judge, I believe there's something

10  July 23.

11           THE COURT:  Well, beautiful.

12           MR. MACORETTA:  But I don't know what that is.  Is

13  that the --

14           THE CLERK:  That's McKesson final approval.

15           THE COURT:  That's McKesson final approval.  I

16  think that's too much.  But if we did them back to back

17  maybe, then people who would be in town otherwise --

18           THE CLERK:  The 24th.  It's a Friday.

19           THE COURT:  The 24th?

20           MR. MACORETTA:  That's fine for us, I think, your

21  Honor.

22           THE COURT:  For a preliminary approval hearing.

23  Who's from Bristol Myers?  There you are.

24           MR. TRETTER:  Hi, your Honor.

25           THE COURT:  You're so far back, you're trying to

1   stay out of the courtroom.  So is that a day acceptable to

2   you?

3            MR. TRETTER:  I'm furiously going through the

4   little calendar on my Blackberry, but I'll say "yes" to the

5   24th of July.  Unless you hear from me otherwise, yes.

6            MR. NOTARGIACOMO:  The same for plaintiffs, your

7   Honor, we'll have to check with other counsel to see if that

8   works, but assuming it does --

9            THE COURT:  My theory was to do it back to back

10  with McKesson on the theory that some of the players were

11  overlapping, and I know Mr. Berman tends to come in from

12  across the country, and I think other people are coming up

13  from other locations.  What's the 24th, is it a Friday?

14           THE CLERK:  Yes.

15           THE COURT:  And then they can do Cape Cod the next

16  day.

17           (Laughter.)

18           MR. MACORETTA:  I'll point that out to Mr. Berman.

19  And, of course, you know, we have a settlement in principle

20  with BMS.  We --

21           THE COURT:  I understand.  If it falls apart, it

22  does.  Maybe we'll just use that date as a status to figure

23  out what I do next.

24           MR. TRETTER:  So what time, your Honor?

25           THE COURT:  Do you want to do it at 2:00 o'clock?

1   And then you can --

2           MR. MACORETTA:  We can do it in the morning,

3   Judge.

4           THE COURT:  You know what my problem is?  I know

5   no one wants to be doing this Friday afternoon.  I just

6   never know what my trial schedule looks like.  What does the

7   24th look like in the afternoon?  Anything else?

8           THE CLERK:  No.  It's open.

9           THE COURT:  Why don't I put it on at 2:00 o'clock.

10  Now, here's the thing:  Keep in touch with Mr. Alba because

11  if I'm not on trial, I'm happy to move it into the morning.

12  I have a solid block for you on the Friday in the afternoon,

13  okay?  All right.  So that's BMS.

14          MR. MACORETTA:  That's BMS.  And that leaves us

15  with the Track 2 global settlement, Judge.

16          THE COURT:  And where are we on that?

17          MR. MACORETTA:  All the notice has not yet gone

18  out because we still haven't gotten the right data from CMS.

19          THE COURT:  When are you going to get that data?

20          MR. NOTARGIACOMO:  We're working with them.  We're

21  trying to get it in so that we can request another final,

22  final approval hearing in late July or early August, and it

23  looks like --

24          THE COURT:  But help me with this.  So when do you

25  think that the notice can go out?

1             MR. NOTARGIACOMO:  By the end of this month, the

2     end of June.

3             THE COURT:  The end of June, notice?

4             MR. NOTARGIACOMO:  And then we want to give

5     consumers 30 days to respond.  All they have to do is send

6     back a postcard that's pre --

7             THE COURT:  All right, so let's just play this

8     out, though.  Maybe we should do a little longer because a

9     lot of people vacation.  I mean, I don't know if this group

10    necessarily.  Actually, this is a huge group.  This isn't

11    necessarily my -- most people, a lot of people won't even

12    focus on it till -- maybe give maybe 40 days or something,

13    give that extra ten days for the July 4 period of time.  And

14    then when would the approval -- people vacation in August,

15    this is my concern, so I want to give people advanced --

16    when do you think would make sense to do a hearing, the

17    second week in August, before the tail end?

18            MR. NOTARGIACOMO:  If you're going to give them

19    40 days, I might push it out a little bit, your Honor,

20    either -- I know you're reluctant to do it in the last two

21    weeks of August because that's prime vacation schedule.

22            THE COURT:  Yes, for lawyers as well as judges and

23    consumers, so I'm thinking of the second --

24            MR. NOTARGIACOMO:  Week in August?

25            THE COURT:  Yes.  And we can always cancel it if

1    it turns out not to be right.

2           So when can we do it, Robert?  Do we have an

3    afternoon in there somewhere?

4           THE CLERK:  August 11 at 2:00 p.m.

5           THE COURT:  So that would be the final approval

6    hearing, is that right?

7           MR. NOTARGIACOMO:  That's correct.

8           MR. MACORETTA:  Part two.  Your Honor had a

9    hearing.

10          THE COURT:  Well, I'm curious as to whether -- I

11   think I do need another hearing, but there are also a series

12   of objections I haven't ruled on and are being briefed,

13   right?

14          MR. MACORETTA:  Yes, and we want to submit further

15   briefing on a lot of these issues, yes, which we will do

16   well in advance of this.

17          THE COURT:  Well in advance because there were a

18   number of objections, some of which I responded to through

19   this supplemental notice requirement.  Okay.

20          MR. MACORETTA:  Was that 2:00 o'clock as well?

21          THE COURT:  Yes.

22          THE CLERK:  That's correct.

23          MR. NOTARGIACOMO:  Yes, there is one piece of

24   this, your Honor, that I don't know the answer to that might

25   affect that date, and that is the supplemental notice that

1  you just mentioned to cash payors, and we're working on a

2  publication schedule.  I assume we can work with that date,

3  but if not --

4          THE COURT:  If not, we'll push it into September.

5          MR. NOTARGIACOMO:  Okay.

6          THE COURT:  There are so many people here from the

7  Track 2 settlement.  Is there any reason anyone knows of

8  that August 11 would be an impossible date for any of the

9  key players who have been very active in negotiating that

10  settlement?  There are what, how many defendants, how many

11  companies?

12          MR. NOTARGIACOMO:  I think, depending on how you

13  count them, eleven or thirteen defendants.

14          THE COURT:  All right.  Has there been one

15  particular spokesperson who's been involved in the

16  settlement?

17          MR. MACORETTA:  There's been a few.  I wouldn't

18  want to put it on just one person, Judge.  I don't see

19  anybody here.

20          MR. BARLEY:  I've spoken for the defendants at a

21  number of hearings, your Honor.  Steve Barley for AmGen.  Is

22  there a particular issue?

23          THE COURT:  I just want to make sure you're

24  available on that date.

25          MR. BARLEY:  I'm available.

1        THE COURT:  Okay.  And so is there someone who's

2   been sending out e-mails on behalf of the defendants?

3        MR. BARLEY:  I'm happy to do that.

4        THE COURT:  Would you, if we have to change it

5   because the noticing doesn't go right, you'd be the point

6   person to just make sure you touch base with Mr. Alba?

7        MR. BARLEY:  Yes, your Honor.

8        THE COURT:  Perfect, thank you.  Okay.

9        MR. MACORETTA:  And then the only thing we have

10  left --

11        THE COURT:  Did you get his name?  He knows who

12  everyone is.  He talks to you all?  All right.

13        THE CLERK:  Most, not all.

14        MR. MACORETTA:  The only thing we have left is

15  Johnson & Johnson.  If you'll remember, you granted them

16  summary judgment.  That's on appeal as well.

17        THE COURT:  But that's on appeal.

18        MR. MACORETTA:  That's on appeal, so that's --

19        THE COURT:  Okay, so now you're done.

20        MR. MACORETTA:  Now we're done.

21        THE COURT:  So essentially there are no more

22  dispositive motions that you have outstanding with me that

23  need to be resolved?

24        MR. MACORETTA:  Not before the First Circuit.

25        THE COURT:  You're almost done with me, depending

1   on what happens with the First Circuit?

2                MR. MACORETTA:  Yes.

3                THE COURT:  So in terms of a global mediation -- I

4   have no idea, it's such a huge suit, how long the First

5   Circuit would take to rule -- should these issues pending on

6   appeal be part of the universal mediation, assuming

7   Mr. Green can do it before the First Circuit rules?  What's

8   your point of view?

9                MR. MACORETTA:  I guess this goes more to -- the

10  only defendants we have left is Johnson & Johnson and

11  AstraZeneca, Judge.  This goes more to them, I mean,

12  although these --

13               THE COURT:  Are you willing to mediate on those

14  two?

15               MR. MACORETTA:  We are.

16               THE COURT:  Okay, so who's here with Johnson &

17  Johnson?  There you are.  For the record, you are?

18               MR. SHAU:  Andrew Shau from Patterson Belknap for

19  Johnson & Johnson.

20               THE COURT:  What do you want to do if there's a

21  mediation?  I'd encourage a try.

22               MR. SHAU:  Yes, the mediation will affect more

23  than just the class case.  It will affect the county cases

24  and the Iowa case, so we would expect to be there anyway.

25               THE COURT:  All right, so I'm going to tell -- and

1    how about from AstraZeneca?

2              MR. WISE:  Scott Wise, your Honor.  We'll be in

3    the same position.  I mean, I think we'll be there for these

4    other cases as well, so there's no reason not to include the

5    class case too.

6              THE COURT:  Okay, thank you.  So I'm going to

7    suggest to him that that's on the table because you'll be

8    there anyway, and we just don't know yet when the First

9    Circuit will rule.  Okay?

10             MR. MACORETTA:  Okay.

11             THE COURT:  Perfect.  So you're done.

12             MR. MACORETTA:  Yes.

13             THE COURT:  You can leave, except to the extent

14   you're representing other clients.

15             MR. NOTARGIACOMO:  I do represent some state

16   clients, your Honor.

17             THE COURT:  Okay.  So maybe at this point I can

18   get the state Attorney Generals up here.  California.

19   Massachusetts is here, I assume?  No.  Maybe not because

20   Mylan is not technically part of this.

21             Well, let me ask you, Mr. Mullen, why don't you

22   come up too because even though -- I don't know you're --

23   you're here, although you're not technically part of this.

24   And I want Uncle Sam here.  Who wants to come up for the

25   federal government?  Mr. Henderson, all right.  Because as I

1    understand it from Mr. Green, one of the big holdups in

2    settling this end of the case is making sure that the state

3    and the federal government are on the same page in

4    settlement.  Have any of you been directly involved with

5    that issue?

6         MR. HENDERSON:  No, not really, your Honor.  We

7    did have a communication with Mr. Green in which he

8    suggested that we attend a meeting with some of the state

9    parties to see if some issues could be discussed, and we

10   said we were willing, but there was no follow-through on

11   that.

12        THE COURT:  So as I understand, part of the issue

13   is, of course, that Medicaid has a federal and a state

14   component, right?

15        MR. HENDERSON:  Yes.

16        THE COURT:  And so the feds are suing on their

17   own, at least through the Ven-A-Care cases, but, in

18   addition, the states are suing both for their share, and in

19   at least one situation, for parens patriae penalties.

20        MR. HENDERSON:  That's correct, your Honor, and --

21        THE COURT:  What do I have to do, if I want a

22   universal mediation, to get the states to be able to settle

23   and have the federal government not be a roadblock, or at

24   least be part of the discussion?

25        MR. HENDERSON:  Preliminarily I don't think the

1    federal government has been a roadblock, in that there have

2    been a number of state settlements that have occurred.

3              THE COURT:  And what happens in them?  Do they

4    release with respect to your half or your portion?

5              MR. HENDERSON:  No.  There is no release unless

6    the federal government gives a release, and usually we

7    require some money to be paid.

8              THE COURT:  Sure.

9              MR. HENDERSON:  Nonetheless, CMS, the position of

10   the Center for Medicare and Medicaid Services is that when a

11   state settles with a defendant for Medicaid overpayments,

12   those overpayments must credit the Medicaid program as a

13   whole, including the federal share.  So that effectively,

14   say, in a state like California where it's 50/50

15   state-federal contribution to Medicaid expenditures, half of

16   the settlement will be credited to the federal share of

17   that.  And that has been somewhat of a problem.

18             THE COURT:  Roadblock?

19             MR. HENDERSON:  Well, except that recently we've

20   seen a bunch of state settlements.

21             THE COURT:  And then what's happening?  Are you

22   getting half of it?  Is that what's happening, depending on

23   the share that the state --

24             MR. HENDERSON:  Yes, half of -- well, it depends

25   who you talk to, but certainly the CMS position is that half

Page 32

1    of that must get credited to the Medicaid program.

2           THE COURT:  And then what happens to you?  Do you

3    then continue to sue the company?

4           MR. HENDERSON:  Yes, we have that ability, and in

5    our three cases against Abbott, Dey, and Roxane, we are

6    doing that.  I would say, I would note that the State of

7    Alabama has actually sued CMS over that policy.

8           THE COURT:  I don't have it, right?

9           MR. HENDERSON:  No.

10          THE COURT:  All right.

11          (Laughter.)

12          MR. HENDERSON:  I'm sure we could arrange to

13   transfer it to you.

14          THE COURT:  No.  I did want to ask you just on a

15   totally different subject, I read the United States just

16   sued Wyeth.  Is that somewhere else?  Is that over this set

17   of issues?

18          MR. HENDERSON:  I'm not familiar with that.

19          MR. HEROLD:  It's different issues.

20          THE COURT:  It's completely different?

21          MS. CICALA:  It's different issues, your Honor.

22          THE COURT:  All right, good.  Yes, go ahead.

23   Maybe you can be helpful here.

24          MR. MONTGOMERY:  There is another twist, your

25   Honor, on the DOJ issue.  This is not the place to resolve

1    it, but there is another Ven-A-Care case against Warrick in

2    which DOJ decided not to intervene.  We have an agreement in

3    principle with Ven-A-Care acting on behalf of the United

4    States.  That settlement also includes the state AG claims

5    by California, which were brought by the Ven-A-Care

6    relators, and then also Florida, which is not before you,

7    but it is part of the settlement.  That settlement has

8    features to it which implicate DOJ or CMS, and I would say

9    that DOJ has definitely been an impediment to finalizing

10   that settlement.  And we may well be submitting that

11   settlement to your Honor without DOJ's imprimatur, and

12   you --

13             THE COURT:  And that's where I would have to make

14   some legal rulings.  Yes?

15             MS. THOMAS:  Representing Ven-A-Care, your Honor,

16   Susan Thomas.  The implications for DOJ are really ones that

17   Schering and Warrick have raised.  They're not an issue from

18   Ven-A-Care's perspective.  It's issues that Schering and

19   Warrick won't address.  We would be prepared to consummate

20   these settlements, but there's issues that the defendants

21   have raised.

22             THE COURT:  Well, because they still have some

23   exposure, is that it?

24             MR. MONTGOMERY:  Yes, your Honor, and this would

25   require more time than you have today, and certainly --

1          THE COURT:  Right.  Well, would this be

2    appropriate for being part of this universal mediation?

3          MR. MONTGOMERY:  We think so, your Honor.

4          THE COURT:  All right, so you're California?

5          MR. PAUL:  Yes, your Honor, and there's one other

6    issue that --

7          THE COURT:  I've been reading a lot about you in

8    the papers, the financial situation in California.  So

9    you --

10         MR. PAUL:  I walked here.

11         THE COURT:  Yes, I thought.  I worried.

12         (Laughter.)

13         THE COURT:  You didn't take the California

14   corporate jet?

15         MR. PAUL:  No.  I got rid of that.  Corporate

16   Model T at this point.  But, your Honor, with respect to

17   your earlier question about issues that tie in with CMS,

18   some of which Mr. Henderson just spoke about, there is one

19   other issue that does complicate the effort to reach

20   settlement, and it's a policy that CMS issued in October

21   that requires the relator's share to come out of the state's

22   recovery entirely, as opposed to the prior practice, which

23   was to take it out of, in a whistleblower case, which was to

24   take it out of the overall recovery.  I.e., in a 50/50 state

25   like California, we would pay half the relator's share, and

1    the U.S. would pay half the relator's share.  And that is a

2    problem.

3                THE COURT:  Is that so?  Is that the way you

4    understand it, Mr. Henderson?

5                MR. HENDERSON:  I'd have to look back at that

6    policy, your Honor.  I can't comment on that.

7                MR. ESCOBAR:  Your Honor, William Escobar on

8    behalf of Dey and Mylan.  Both of my clients are involved in

9    federal cases, Ven-A-Care cases, and a variety of state

10   cases, and this issue of the federal and state shares is a

11   significant obstacle when we're having discussions.  In

12   fact, in the Alabama lawsuit against CMS, the Alabama

13   complaint says that the CMS position that has been described

14   here is an obstacle to settlements because the state is not

15   able to agree on the settlement without risking some portion

16   of that settlement being claimed in advance by CMS.  And

17   from our perspective, we're not able to get releases.  So

18   you have a real obstacle here and an issue that really has

19   to be addressed.  If we can separate out -- you know, we

20   would fight the federal share in the federal cases, and if

21   the states are able to talk and deal on the state share

22   issue, I think it would facilitate settlement at both ends.

23               THE COURT:  Well, let me just ask the federal

24   government, as I look at you:  You're willing to be part of

25   this universal mediation?

1          MR. HENDERSON:  We're willing to meet with parties

2     to discuss these issues.

3          THE COURT:  No, but universally so we can have

4     some guidelines, so when the states come in -- I don't know

5     anything about it, okay, so I'm talking off the top of my

6     head, but it does sound reasonable that if it's a 50/50

7     split, then it's 50/50 goes to the relator, I mean, on that

8     really minor narrow issue.  You know, especially if the

9     state has been spending the legal bills to garner the

10    settlement, I don't know why the federal government gets to

11    be a free rider, but maybe there's something I don't know.

12    I'm just simply saying, at the very least, it should be

13    negotiable.

14         MR. HENDERSON:  Perhaps so, your Honor.

15         THE COURT:  So do you have authority now to say

16    you'll be part of this mediation?

17         MR. HENDERSON:  Not really, but I think it likely

18    that we would be able to with a caveat, your Honor.  On this

19    issue, we would participate.  We would have somebody come

20    and participate.  I will say that as to the cases that we're

21    litigating, we have a summary judgment schedule that is

22    going to keep all our resources --

23         THE COURT:  Do you know how many people need a

24    job?  They'd love to work.

25         MR. HENDERSON:  I need a vacation.

1          THE COURT:  They'd love to let you go on vacation

2     and work on this brief.  But I think I don't want to hold up

3     these discussions for a summary judgment briefing schedule.

4     You know, Professor Green cared enough to call me up and

5     want a breakfast saying that there are some things that are

6     just going to -- use "roadblock," use "impediment," use

7     whatever -- that are just going to have to be worked out

8     systemically, for want of a better word, institutionally to

9     see if there are -- and I trust him.  I mean, he's been so

10    good in this case.  If he's telling me this is one of his --

11    he just outlined it for me -- this is one of the big issues,

12    I'd like at least people to be willing to talk through --

13         MR. HENDERSON:  And we have previously indicated

14    to Professor Green that we would be willing to do that, have

15    a CMS person attend and a DOJ person attend.

16         THE COURT:  Who at DOJ is calling the shots?  Is

17    there a new chief of the Civil Division?

18         MR. HENDERSON:  There's Joyce Branda there but

19    also Dan Anderson.

20         THE COURT:  Are these new kids on the block?

21         MR. HENDERSON:  No.  No, they're career people.

22         THE COURT:  So they've been involved all along?

23         MR. HENDERSON:  Yes.

24         THE COURT:  All right, so maybe have some of those

25    folks come on up.

1          MR. HENDERSON:  Yes, and somebody from CMS who

2     would be very familiar with the policy issues involved.

3     That would be fine.  I think it would probably not be

4     somebody on the litigating team because we're going to be

5     busy.

6          THE COURT:  All right, that's fair enough.

7          Now, I'm going to just ask each of the -- and I'll

8     get to you in a minute -- just on where the status of each

9     of your cases is.  So why don't we start with California.

10         MR. PAUL:  Yes, your Honor.  For California, our

11    case is about at the end of discovery.  The cutoff date is

12    June 15.  Our expert reports for the plaintiffs are due

13    June 30, and the defendants' are due July 30, and our

14    summary judgment briefing is due October 30.

15         THE COURT:  So do we have a hearing date yet for?

16         MR. PAUL:  We have a hearing on, I think it's

17    January 20, your Honor.

18         THE COURT:  Of 2010?

19         MR. PAUL:  Yes.

20         THE COURT:  All right, so would California be

21    willing to participate in this mediation?  Do you have any

22    state policies that would prevent it?

23         MR. PAUL:  No, your Honor.  We'll be there.

24         THE COURT:  Okay.  All right, so is there anything

25    else you want to tell me about your case?

1    MR. PAUL:  No, your Honor.  We did have a

2    mediation at the end of April with Eric Green.

3    THE COURT:  And I know you probably can't say

4    publicly, you know, is it likely to settle, but were there

5    any systemic issues that you thought might be addressed?

6    MR. PAUL:  Well, it was complicated a little bit,

7    I think, by the issue I spoke about in terms of the state

8    recovery.  If the state has to pay the entire relator's

9    share, that affects our position, obviously, and I think

10   Mr. Escobar just spoke about it from another angle, so --

11   THE COURT:  Which is the release.

12   MR. PAUL:  Yes.

13   THE COURT:  What is the exposure at the end of the

14   day with respect to the federal and state government all

15   together?

16   All right, so when you settle something, let's say

17   you take a drug and you settle it, you're settling it just

18   for what the Medicaid loss is?

19   MR. PAUL:  Well, for both the federal component

20   and the state component, your Honor.  That's always been our

21   practice is to get a recovery and --

22   THE COURT:  So if 50 cents is paid by the federal

23   government and 50 cents by you, you're looking for a hundred

24   percent recovery, and then you give back the 50 percent?

25   MR. PAUL:  Yes, your Honor.

1      THE COURT:  So are all the states taking that

2  point of view?  So you're essentially suing on behalf of the

3  federal government.

4          Now, do you take a different view, Mr. Henderson?

5      MR. HENDERSON:  No.  We agree that when the state

6  sues, the state should recover the full amount and credit

7  whatever the federal share is back to the Medicaid program.

8  That does not extinguish our claims.  We are entitled to

9  treble damages and typically in these cases where we have

10  oftentimes different drugs.  So our claims are not

11  extinguished, but at the end of the day, there would be some

12  offset.  If, for example, the defendant can show how much

13  was paid to California for a particular drug and we get a

14  judgment at the end of the day, there would be an offset for

15  the amount that was credited back to the federal share of

16  the program.

17      THE COURT:  But from a defendant's point of

18  view -- just let's assume, you know, there's one drug --

19  does the settlement come as specific as it's for this drug,

20  this amount of money for this time period?  Is it that

21  specific, or is it a lump sum with respect to every

22  manufacturer?

23      MR. PAUL:  In the settlements California has

24  reached to date in the AWP litigation, your Honor, it's been

25  for a specific time period and specific drugs.

1          THE COURT:  So you'd be able to know which drug it

2   was and which NDC number and that sort of thing?

3          MR. PAUL:  Yes.  Yes, your Honor.

4          THE COURT:  And so then you would then come along

5   and say, "Well, 50 percent of that is mine."  And then do

6   you then second-guess the amount and then want to treble it?

7          MR. HENDERSON:  We --

8          THE COURT:  So let's say 50 cents.  Do you say,

9   "Oh, no, no, really, it should have been $2.50"?

10          MR. HENDERSON:  Correct, yes, we may, if we wish

11   to.

12          THE COURT:  And then you'll want to treble it.  So

13   a defendant almost has --

14          MR. HENDERSON:  They'd have some extra exposure

15   if, for example, the settlement is 50 cents on the dollar or

16   a small portion of the damages.

17          THE COURT:  So what would it take to get you in to

18   settle it so a manufacturer could just wrap it up?

19          MR. HENDERSON:  Money.

20          THE COURT:  But are you in these discussions?

21          MR. HENDERSON:  No, we have not been part of these

22   discussions.  We've --

23          THE COURT:  So from a manufacturer's point of

24   view, you would like them to be part of this?

25          MR. ESCOBAR:  No, your Honor.  I think what we

1    want to be able to do, and this is something --

2            THE COURT:  All right, so maybe I'm wrong, all

3    right.

4            MR. ESCOBAR:  But what you just heard sets out the

5    problem for us.  Mr. Henderson's case against us is suing us

6    on the federal share of all states across the country,

7    including California.  California is suing us in the state

8    case for both the federal and the state share.  Now, we're

9    happy to have --

10           THE COURT:  You're just suing for the federal

11   share, right?

12           MR. HENDERSON:  Yes.

13           THE COURT:  All right.

14           MR. ESCOBAR:  Right.  So, now, we want to be able

15   to -- one possibility, which, frankly, would be one that

16   makes the most sense, I think, is that we would be able to

17   talk directly to California about the California state case,

18   about its settlement with California that is only for the

19   state portion that they're claiming, and therefore leave the

20   rest, the federal share, in the federal case where we're

21   litigating not only in California but in other cases.

22           THE COURT:  So that for you would be an acceptable

23   settlement approach.  In other words, California would get

24   the 50 cents, and you would just leave me and the two of you

25   to resolve the federal piece.

1          MR. ESCOBAR:  Well, they would get less than that,

2    your Honor, but we won't go into --

3          THE COURT:  No, no, right, but --

4          MR. ESCOBAR:  But that's correct, your Honor.

5          THE COURT:  Is that an acceptable -- I think this

6    is what Professor Green wants to try and actually work out

7    is a method of going forward because right now I think he

8    feels it's stuck.

9          MR. HENDERSON:  Well, right now, as I said, your

10   Honor, we've indicated to Professor Green we're willing to

11   talk about these issues.  There is a clear policy statement

12   issued by CMS that says that a state must credit the federal

13   share.

14         THE COURT:  Right, that's why we need CMS.  This

15   is stuck.  I mean, I was only half teasing when I was

16   referring to California's dire financial straits, but you

17   have the largest Medicaid system in the world, right, or in

18   the country certainly, right?

19         MR. PAUL:  It is, your Honor, in terms of amount

20   of money and drugs.

21         THE COURT:  And I don't know, you don't believe

22   everything you read in the paper, but it sounds pretty dire.

23   I'm just saying that these states need the money, and so if

24   there's a way of -- not that the federal government doesn't,

25   for sure, but I'm just simply saying, I'd hate to hold this

1   all up because I can't get the releases.  There's got to be

2   a set of guiding principles that we can work off of, so that

3   if you're not happy with what they're doing, it leaves you

4   free to fight on, but doesn't hold up their side.  And

5   that's what I'm hoping will be accomplished by the

6   mediation.

7             New York stands.  How many counties?

8             MS. CICALA:  Forty-three and the city, your Honor.

9             THE COURT:  Okay.

10            MS. CICALA:  If I may, just a couple of points.

11   Setting aside the CMS letter of October of '08 for a moment,

12   the federal government is only prosecuting three cases.  So

13   there's only three cases where this issue may be most

14   pronounced, and perhaps a mediation could focus just on

15   those three, Abbott, Dey, and Roxane, setting aside the

16   Schering Warrick issue that was mentioned earlier where you

17   have the case that the DOJ didn't intervene into.  So that's

18   my first comment.  Yes, you have an overlap of prosecution,

19   but it's confined to only three defendants.

20            Secondly --

21            THE COURT:  So is there anything holding -- with

22   respect to the others, do you think we can get the

23   releases -- that's a really excellent point --

24   Mr. Henderson, with respect to the others that you're not

25   suing?

1    MS. CICALA:  I certainly can't speak to that.  If

2    I can just make one other --

3    THE COURT:  Yes, I'm sorry, yes.

4    MS. CICALA:  My understanding of the state law in

5    New York and Iowa is, this notion of sending money back to

6    the feds apart from CMS, there's no choice involved here.

7    If the New York counties recover a dollar, they're sending

8    25 cents to the state and 50 cents to the feds, assuming old

9    percentages apply, no matter what they call that dollar.  So

10   it's not an election on anyone's part; it's a requirement

11   that the money has to be allocated this way.

12   In the settlements that we've reached thus far

13   with defendants, and we have quite a few in New York and

14   Iowa, we have --

15   THE COURT:  Where are you on -- I know we've got

16   an opinion we owe you, right?  There's a pending issue, and

17   you're supplementing with rebate information.

18   MS. CICALA:  Yes, that's on the GSK partial

19   summary judgment motion, your Honor, that's right.

20   THE COURT:  Right, and that's what I owe you,

21   but --

22   MS. CICALA:  We first are going to submit

23   supplemental papers to your Honor pursuant to a schedule

24   that we submitted about a week ago, which your Honor

25   endorsed.

1          THE COURT:  Right.

2          MS. CICALA:  And then the summary judgment

3     briefing is taking place with regard to the claims, the FUL

4     claims, where both plaintiffs and defendants filed their

5     briefs, and we have a hearing scheduled for July 8 on that.

6     So we have summary judgment briefing taking place on what we

7     think are the two of the three areas of reimbursement at

8     issue in the case, the brand reimbursement, the generic FUL

9     reimbursement.  Separately, of course, there's the generic

10    non-FUL reimbursement where there's no summary judgment

11    activity at the moment, though we expect there to be that

12    activity in the short term.

13         THE COURT:  What is your position on settlement?

14         MS. CICALA:  Well, with regard to settlement,

15    without naming any names, New York has reached handshake

16    agreements, at least, or is in the process of negotiating --

17         THE COURT:  I've got a whole lawsuit this morning

18    on handshakes, so just get it in writing, but, I mean --

19         MS. CICALA:  Yes, we're working on the writings,

20    but nine, possibly ten defendants for New York and ten

21    defendants for Iowa, your Honor.

22         THE COURT:  Are settled or settling possibly?

23         MS. CICALA:  Yes.  We're drafting --

24         THE COURT:  Preliminarily.  So will that still

25    leave something for me to do in the New York cases?

1           MS. CICALA:  Absolutely, your Honor.

2           THE COURT:  I thought so.

3           MS. CICALA:  These tend to be, with a few minor

4    exceptions, these tend to be our smaller defendants, but --

5           THE COURT:  So you've settled, let's say on a

6    handshake, with these smaller cases.  Have there been any

7    impediments from the federal side?

8           MS. CICALA:  None.

9           THE COURT:  Are you getting releases from the

10   federal government?

11          MS. CICALA:  No, nor have defendants pressed for

12   them in any way, your Honor.

13          THE COURT:  So it hasn't been a problem in those

14   cases?

15          MS. CICALA:  That's correct.  And that's my

16   understanding of how things have typically worked when there

17   are state settlements at issue; the defendants do not press

18   for the federal release.  Of course, they press for the

19   state release, although even in some of our county

20   settlements, there hasn't even been a press for a state

21   release.

22          THE COURT:  So have you been finding it in

23   California an impediment to settlement?

24          MR. PAUL:  No, your Honor.  Quite frankly, I think

25   we look at the more serious impediment is this issue of the

1   relator's share.

2           THE COURT:  The relator's share is the -- yes, go

3   ahead.

4           MR. MONTGOMERY:  Although our settlement, your

5   Honor, that I described to you a moment ago does include

6   California.  Now, I don't think our problem is necessarily

7   with the California aspect of the case.  But I do think,

8   just as a structural matter, DOJ is essentially sitting on

9   the sidelines with respect to every case that it's not

10  directly involved in.  So the notion of subdividing the DOJ

11  participation and the CMS participation in any broader

12  conversation that you might or we might be having in

13  mediation I think is probably a mistake.

14          THE COURT:  But it's interesting to find out that

15  at least with respect to the smaller cases, it's not such an

16  impediment that settlement can happen.

17          MR. MULLIN:  Your Honor --

18          THE COURT:  I'll get to you.  Hold on.

19          MR. MULLIN:  Your Honor, Peter Mullen on behalf of

20  the Commonwealth of Massachusetts.  We've settled with seven

21  out of thirteen defendants, including two of the defendants

22  that the federal government has cases pending against;

23  namely, Dey and Roxane.  The Commonwealth of Massachusetts

24  gave Dey and Roxane releases consistent with the scope of

25  our complaint, and there was no impediment, no concerns

1    expressed with regard to the pending federal cases.  So

2    that, you know, the federal government only has active cases

3    in its own name as to three defendants.  So that for the

4    vast majority of defendants, I don't think the likelihood of

5    a federal suit is an issue, merely because the statute of

6    limitations is well beyond at this point.  You know, it has

7    not been a problem for us in our case.

8             THE COURT:  Okay, thank you.

9             You're with Ven-A-Care, right?

10            MS. THOMAS:  Ven-A-Care, yes.  Just in response to

11   the New York and Massachusetts points, although the federal

12   government has only intervened as to three defendants, we as

13   the relator have brought an un- or nonintervening case that

14   involves seven additional defendants on a federal basis.  So

15   I just don't want that to not be clear.

16            THE COURT:  And where is that case?

17            MS. THOMAS:  That case is in its infancy, your

18   Honor.  There's a motion to dismiss pending, and although

19   that motion to dismiss involves public disclosure issues and

20   other issues, your Honor has ordered that original-source

21   discovery proceed, which somewhat under protest we are

22   doing.

23            THE COURT:  All right.  So do we have a hearing

24   date to supplement?  Do we have a next date in your case?

25            MS. THOMAS:  We have a date when the original

1   source discovery ends, July or August, but we're waiting on

2   your Honor's ruling on the motion to dismiss, I think.

3   Although the case is in its infancy, many of these

4   defendants are in fact being sued elsewhere, including the

5   Ven-A-Care state cases.  So there's a lot of the discovery

6   which we think will be done by the time we get there.  And,

7   of course, the CMS and state Medicaid discovery that's

8   already taken place should be applicable.  So although

9   there's not actual discovery taking place on these

10  defendants in the nonintervening case, we think when your

11  Honor rules on the motion to dismiss, there will in fact be

12  a fair bit of progress that's already happened.

13          THE COURT:  All right.  So do you want to be part

14  of this universal mediation?

15          MS. THOMAS:  Yes.

16          THE COURT:  All right, so that includes -- what's

17  the sub-number of your case?

18          MS. THOMAS:  I do not know offhand.  The first

19  named defendant is Actvis, and the other -- we also have a

20  nonintervening case as to certain of Abbott's drugs, the

21  case that we refer to as Abbott-Ery for the erythromycin

22  drugs.

23          THE COURT:  All right.

24          MS. THOMAS:  And that is on the same schedule as

25  the three federal cases, but the federal government did not

72fe4b07-ff68-4ab0-9daf-1849027a1147

1    intervene as to those drugs.

2           THE COURT:  Are any of the state Attorney Generals

3    objecting to being part of a universal mediation?

4           MR. PAUL:  California is willing, your Honor.

5           MR. MULLIN:  Massachusetts is willing, your Honor.

6           MR. CARTER:  And I think South Carolina and Utah

7    would be willing as well.

8           MR. NOTARGIACOMO:  Montana and Nevada have been --

9           THE COURT:  They're gone.

10          MR. NOTARGIACOMO:  And they're almost settled in

11   their own states, so that is not an issue.  The only other

12   state is Arizona, and the procedure that's a little

13   different, as I understand it, although I haven't been close

14   to it, that case is brought solely on behalf of the state

15   itself for civil penalties under the Arizona Consumer

16   Protection Act.

17          THE COURT:  I had problems with that because --

18          MR. NOTARGIACOMO:  Understood, your Honor, and

19   actually it's been stayed pending -- you encouraged the

20   parties, and I believe the parties agreed, to stay that

21   litigation pending the First Circuit decision.

22          THE COURT:  But even on top of that, I don't

23   see -- it creates a level of exposure for people if they

24   settle the state -- I'm trying to remember, but, in any

25   event, assuming for a minute Arizona stays in the case from

1   a class action point of view, I think that would make it

2   difficult to settle the class action, if they thought they

3   had exposure for penalties in addition.  So would you be

4   willing to be part of that settlement discussion for

5   Arizona?

6          MR. NOTARGIACOMO:  For those defendants that

7   haven't already been settled.  But the next thing I was

8   going to say is that there are a number of defendants that

9   we already have settlement -- either we've reached a

10  settlement in principle and we're working on an agreement,

11  or we have an agreement that has yet to be presented for

12  settlement.

13         THE COURT:  On a penalty case.

14         MR. NOTARGIACOMO:  On the penalty case.

15         THE COURT:  So there's really a big question in my

16  mind what I do if there was a national -- I think you need

17  to be there because how do I count that?

18         MR. NOTARGIACOMO:  I'm sure we'd be willing to be

19  there, your Honor.  I'm not prepared today to say, you know,

20  if we already have a settlement with a defendant, what we

21  would be able to offer by way of those defendants if we've

22  already made an agreement.

23         THE COURT:  Well, with respect to those

24  defendants, what happens to those penalties?  Does it go

25  back to the citizens, I mean, the injured parties?

1          MR. NOTARGIACOMO:  I'm not sure.  I don't know

2    whether it goes to the state coffers or whether there's an

3    attempt to distribute back to the consumers.

4          THE COURT:  I'd really want to know that because

5    it does strike me that that would be another impediment to

6    settlement if it's a back-end kick after you've -- why would

7    you settle with the class if you thought the money was going

8    back to some of these people?  I don't know what Arizona

9    plans on doing with it, so I would very much want Arizona to

10   be part of it.

11         Yes, go ahead.

12         MS. CICALA:  The New York counties and the City of

13   New York and Iowa would certainly participate in the

14   settlement.  I do want to propose that some thought be given

15   to breaking out brand versus generics.  I think, in terms of

16   productivity of any universal settlement, there may be

17   something to be said for separating out the groups.  That's

18   our experience, at least to date, that when we have both in

19   the same room, it's very difficult to have constructive

20   dialogue.

21         MR. MONTGOMERY:  Your Honor, many of the

22   defendants had a preliminary discussion before coming over

23   here today, and I think many defendants are interested in

24   participating in mediation.  Counsel needs to talk to the

25   clients.  But we are all going to be interested in the

1   structure of the mediation, and that may affect how some

2   defendants react to the prospect.  And so I really do think

3   as one structural point that we would agree with Ms. Cicala,

4   that there really needs to be generics and brands

5   separately.

6           THE COURT:  I don't know how -- is it possible to

7   have a spokesperson from each of the key defendants, a few

8   defendants, one maybe brand, one generic, one from the

9   relator, one from the federal government, one from the state

10  governments, just to meet with Professor Green to come up

11  with a structure so you can then present it to your general

12  counsel?

13          MR. MONTGOMERY:  We discussed just that

14  possibility.  We think that that's an excellent idea.  We're

15  sure that Professor Green will have some suggestions

16  himself, and we could come up with a structure and involve

17  your Honor to the extent that Professor Green thought

18  appropriate, and hopefully come to an agreement on how to

19  proceed.

20          THE COURT:  I think that does make the most sense.

21  Does anyone disagree with that?  And then I'll at that

22  point -- all right, so listen and see if this is right --

23  order everyone to mediation on the agreed-upon structure.

24  I'll have Professor Green come up with a final one.  And if

25  people decide at the end of the day they don't want to

1  participate, that's your right.  It's not binding in the

2  sense of, if you go in and you don't want to be part of this

3  process, I suppose I don't think I have the authority to

4  require people to mediate it.  But I think to the extent we

5  can -- I see this just going on endlessly unless some of

6  these structural things are resolved.

7          In the meantime, I'm not going to let up on the

8  motions.  I mean, I've hired up for next year.  I've got

9  plenty of people ready to go.  And so I'm planning on

10 chugging through the motions, but I do want to be ready to

11 just settle out what can be settled out and then just

12 address what's left.

13         Mr. Henderson, yes?

14         MR. HENDERSON:  I just want it to be clear, your

15 Honor.  The United States is willing/amenable to have a

16 participant at these mediations.  With regard to the

17 intervened cases that we are now litigating, I think our

18 view is twofold:  One, we've been very unsuccessful in

19 mediations thus far, and are not amenable to further

20 mediation absent some movement from the defendants.

21         THE COURT:  Well, it may be that you decide to opt

22 out on a dollar figure, but what I would require you to

23 attend, actually, is to at least try and mediate some of

24 these issues with respect to how to allocate relators'

25 shares and how to deal with the release issues.

72fe4b07-ff68-4ab0-9daf-1849027a1147

1        MR. HENDERSON:  And that we are willing to do.

2        THE COURT:  That makes some sense to me.  And then

3   you may just decide you can't, and I will, you know,

4   obviously respect that.  You're a little newer in the whole

5   process.  But it makes no sense for me to be holding up all

6   these state settlements.  Is there any -- there was one case

7   that I'd never heard of before, so let me just -- I worried

8   that I would -- oh, yes, United States, ex rel Linnette Sun

9   and Greg Hamilton V. Baxter Hemoglobin, does this ring a

10  bell to anybody?  Dickstein Shapiro?

11       MR. DELANCEY:  Merle Delancey for Baxter, your

12  Honor.

13       THE COURT:  Apparently nothing has happened about

14  that case, and I didn't even know I had it when we were

15  trying to just get prepared for this.  So what's happenings?

16       MR. DELANCEY:  We've been talking to plaintiffs'

17  counsel trying to get something resolved, and it doesn't

18  look like we're going to be able to.  I don't know if

19  plaintiffs' counsel is here, at least one of them.  There's

20  two relators in the case.

21       THE COURT:  Should I just set that up for a

22  scheduling conference?

23       MR. DELANCEY:  We're ready for a CMO.  Let's go.

24       THE COURT:  Let's go?  How long is that -- I'm

25  backwards to ask -- is that --

1          MR. DELANCEY:  It originally came as a qui tam out

2     of Colorado.  It hasn't been here -- maybe December of last

3     year.

4          THE COURT:  Oh, all right, so I'll not feel too

5     bad about it.

6          Is there any other matter that I should be

7     addressing here that has slipped through the cracks, you

8     think why haven't you ruled?  Oh, God, I was hoping no one

9     would stand up.  Okay, so --

10         MR. HENDERSON:  Well, we just have some issues

11    that don't involve the whole group, just in our three

12    intervened cases about summary judgment proceedings, some

13    mechanical issues that I think we'd like to address.

14         THE COURT:  All right.  And what would you like to

15    address?

16         MR. CARTER:  Your Honor, Clint Carter.  You

17    noticed this hearing for the State of Utah, and I represent

18    the State of Utah.  There are three Utah cases, and we

19    believe all three have been remanded.

20         THE COURT:  All right, so Utah is gone.

21         MR. CARTER:  It should be.

22         THE COURT:  The great state of Utah.

23         MR. CARTER:  That's right.

24         THE COURT:  All right, so all I've got left is the

25    South Carolina, but you're on track?

1           MR. CARTER:  We are.  There are, I think, fourteen

2      AWP cases that are actually filed in state court in South

3      Carolina, and then there are two in this court.  But

4      discovery is ongoing, and we're on track, and we'll

5      participate in the mediation.

6           THE COURT:  You've actually just raised a fabulous

7      issue that I meant to bring up, which is I know that I

8      remanded -- in the beginning, much of what I did was -- what

9      I kept here and what I remanded was a triaging.  Should the

10     state cases be part of it, or does it make it too huge?  In

11     other words, the ones I remanded, is there anything left on

12     the ones I remanded?  Are they still going on?

13          MR. CARTER:  I know that we represent other states

14     that have been here where the Court has remanded those, and

15     we're seeking trial dates and actively moving those cases

16     forward.  We've settled them in some states.

17          THE COURT:  Let me ask, from the defense point of

18     view, which may be really what's left, is there anyone here

19     who is actively involved in a state case where it might be

20     appropriate to bring them into a universal mediation, if the

21     state court judge was willing?  Well, would you talk about

22     that when you do it and see because --

23          MR. MONTGOMERY:  It may make sense if Eric Green

24     is already engaged in those cases.  If it's brand-new to

25     Eric Green, then I think I can imagine some real

1   impediments, but those involved will have to talk.

2          THE COURT:  Maybe this is something you raise on

3   the mediation on mediation?

4          MR. MONTGOMERY:  Very good idea.

5          THE COURT:  All right.  I feel like I'm dealing

6   with the Mideast or something.  So fine.  So we're going

7   to -- how at this point -- and I don't want to have everyone

8   sit here, Mr. Henderson, through this summary judgment just

9   on your cases.  So I'm thinking I can let everyone go, we

10  can take a break, and then whoever is left who needs to deal

11  with this, your unique case, we can go.

12         How are we going to decide right now who wants to

13  go to Eric Green and be part of the mediation and what this

14  looks like?  Do you want me to just -- you can come in, and

15  the defense can organize itself, and then I'll let the

16  plaintiffs organize?

17         MR. MONTGOMERY:  We'll organize ourselves, your

18  Honor.

19         THE COURT:  Okay, so you'll organize yourselves.

20         MR. PAUL:  Your Honor, I think, I talked to

21  Joanne, and we'll organize ourselves, the states.

22         THE COURT:  So the states will come up with a

23  representative.  Mr. Henderson, either you or, as you say,

24  you might be briefing summary judgment, the CMS and

25  higher-ups in Washington will show up.  Ven-A-Care will come

1   up with somebody.

2              MS. THOMAS:  Yes, your Honor.

3              THE COURT:  And of course the class plaintiffs.

4              MR. NOTARGIACOMO:  Yes, your Honor.

5              THE COURT:  Any other entity that should be part

6   of that?  I think that's about it.

7              He said he has free time on June 26 or 27.  I

8   think that might not be a terrible -- oh, God, you have a

9   vacation with your kids or something, right?

10             MS. CICALA:  No.  The vacation is later, but, you

11  know, we have that FUL summary judgment briefing which wraps

12  up on June 30 and the supplemental submissions for the GSK

13  summary judgment at the end of June, so we've got a

14  tremendous amount of litigation activity between now and

15  June 30 happening in the New York cases.  And we don't have

16  the luxury of --

17             THE COURT:  What if we just moved all that off by

18  a week and gave -- I think all this is going to be is not

19  that substantive as much as it is going -- I mean, what is

20  this going to look like so that everyone can see if they

21  want to buy into it?

22             MS. CICALA:  If we could -- pushing off the

23  mediation even by a week, your Honor, is that what you mean?

24             THE COURT:  No, no, no.  This is what he gave me,

25  so I think this is the soonest you can get in the front door

72fe4b07-ff68-4ab0-9daf-1849027a1147

Page 61

1    to see him.

2              MS. CICALA:  Okay, then we'll make it work, your

3    Honor.

4              THE COURT:  And then if you want by stipulation --

5    I'm not here to destroy your July 4 weekend, so if you want

6    to put this off by a week or two, put it off by a week or

7    two.

8              MS. CICALA:  Thank you, your Honor.

9              MR. MONTGOMERY:  But, your Honor, we do have an

10   argument date.

11             THE COURT:  What date is it?

12             MR. BUEKER:  I think it's July 8, your Honor.

13             MS. CICALA:  We'll be in touch with counsel.

14   We'll work it through.

15             MR. MONTGOMERY:  It implicates your Honor's

16   schedule.

17             THE COURT:  I'm not sure you -- I know you're

18   critical to all this, but I'm just sort of thinking maybe

19   California and Massachusetts could at least, and you could

20   be in telephone contact.  I'm not requiring every state AG

21   to come in.  I think we only need one representative from

22   the states.

23             MS. CICALA:  Thank you, I understand, and my

24   partner, Dan Hume who's here, can certainly participate in

25   the mediation on behalf of my client.

1            THE COURT:  Okay, all right.  So I'm going to

2      encourage all of you -- I'm going call him up right

3      afterwards, and, ideally speaking, I'm going to tell him

4      that you're all going to try and be available on the 26th.

5      And do you have a mechanism of being in touch with him as to

6      who's going to come?

7            MR. MONTGOMERY:  Yes, we can certainly talk to

8      Eric by telephone.  I think we're going to have to make an

9      assessment and he will have to make an assessment as to

10     whether we can actually have a real mediation process on the

11     26th and 27th, or whether the organizational issues are more

12     complicated than any of us are acknowledging.  But Eric can

13     help us with that.  But I think those two dates are fine,

14     but what they might turn out to be I think remains to be

15     seen.

16            THE COURT:  Right.  Just I think what I wanted to

17     do was to say we've been at this for eight years.  It's a

18     huge -- I think class counsel has only recently just been

19     paid, has put a huge amount of resources into this thing,

20     and it's worth an effort.  If it doesn't work, it doesn't

21     work.

22            You rise from the midst?

23            MR. MATTHEWS:  James Matthews of Sherin and Lodgen

24     on behalf of Watson.  Like Mylan and Dey, Watson is in many

25     of the cases before your Honor and in many cases around the

1   country in state AG actions.  We have participated in the

2   mediations, and in particular the New York county mediation

3   to date.  We are certainly interested in participating in

4   the mediation that you schedule after this hearing.  I would

5   be remiss, however, not to inform you that Watson is

6   scheduled to go to trial on an AWP case against Alabama

7   starting on June 22.  So if the 26th and 27th is merely an

8   organizational meeting --

9               THE COURT:  It's just merely organizational.

10              MR. MATTHEWS:  If it's going to be that, that

11  would probably be okay, but I just wanted to mention that we

12  could not --

13              THE COURT:  I take it it's not going to settle?

14              MR. MATTHEWS:  Well, you never know until you try

15  the case, but it doesn't look that way right now, your

16  Honor.

17              THE COURT:  So enjoy Alabama, so you're going to

18  be --

19              MR. MATTHEWS:  Montgomery is a very nice town, as

20  Mr. Carter, who will be there as well, knows.

21              THE COURT:  You're going to be there?

22              MR. CARTER:  I'm going to be there, yes, your

23  Honor.

24              THE COURT:  You're the trial counsel?

25              MR. CARTER:  Absolutely.

1          THE COURT:  How many of these have actually gone

2    to trial?

3          MR. CARTER:  This will be the fourth trial in

4    Alabama, I believe.

5          THE COURT:  Wow.  And what's happened in the other

6    three?

7          MR. CARTER:  Let's see, the first trial was

8    against AstraZeneca.  It was a verdict for the plaintiff.  I

9    apologize, it was a hundred something million, $175 million.

10   The second trial was against GSK and Novartis, a verdict for

11   the plaintiff, I think 30 something versus Novartis and

12   80 something against GSK, million.  The last trial was

13   against Sandoz, also a verdict for the State of Alabama, I

14   think 70 plus million.

15         THE COURT:  So let me just ask you this:  Since we

16   like to think about bellwether trials, is there something

17   unique to Alabama's law that would make us think that it's

18   not --

19         MR. HEROLD:  Your Honor, I'd be happy to speak --

20         (Laughter.)

21         MR. WISE:  There are many things unique about

22   Alabama, your Honor.

23         THE COURT:  I mean, that's a pretty good winning

24   streak.  What's the story?

25         MR. WISE:  But to complete the story there, all

1  those cases are now pending on appeal in the Alabama Supreme

2  Court.

3      THE COURT:  On questions of law or class cert or

4  all of the above?

5      MR. WISE:  They're not class cases, but --

6      THE COURT:  Oh, I see, because they're all AG --

7      MR. WISE:  Correct.

8      MR. HEROLD:  They're fully briefed in the Alabama

9  Supreme Court, your Honor.

10     THE COURT:  But putting aside for a minute -- I'm

11 sure you always do raise excellent legal issues -- on a

12 sense of it is worth -- is there any other state that's been

13 trying these cases?

14     MS. CICALA:  Yes.  Wisconsin and Missouri have had

15 trials recently, your Honor, Missouri against Schering and

16 Warrick, a victory -- well, it was settled ultimately after

17 a jury verdict initially for the state.  And then Pharmacia

18 was tried by the Wisconsin AG, again a jury verdict for the

19 state, your Honor.

20     MR. MONTGOMERY:  And you'll recall that West

21 Virginia --

22     (Laughter.)

23     MR. MONTGOMERY:  -- went to trial against Warrick,

24 and that was a verdict for Warrick.

25     THE COURT:  All right.  But this is worth just

1    saying publicly, so it creates some impetus to settlement.

2    And I'm sure there are great legal issues because these

3    statutes are very difficult sometimes to follow in this

4    context, but, still, it gives a sense of the exposure.

5              So I want to take a break now.  Lee has been going

6    all morning on a trial, and we're going to take a

7    fifteen-minute break.  And then I'm hoping, Mr. Henderson,

8    who else should be here on these issues?

9              MR. MERKL:  Both sides are here, your Honor.

10             THE COURT:  Everybody's here?  Why don't you try

11   and work it all out in the next fifteen or twenty minutes,

12   and if not, I'm here.  Okay?  Thank you very much.

13             (Adjourned, 3:25 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

72fe4b07-ff68-4ab0-9daf-1849027a1147

1                      C E R T I F I C A T E

2


3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6


7           I, Lee A. Marzilli, Official Federal Court

8   Reporter, do hereby certify that the foregoing transcript,

9   Pages 1 through 66 inclusive, was recorded by me

10  stenographically at the time and place aforesaid in Civil

11  Action No. 01-12257-PBS, In Re:  Pharmaceutical Industry

12  Average Wholesale Price Litigation, and thereafter by me

13  reduced to typewriting and is a true and accurate record of

14  the proceedings.

15          In witness whereof I have hereunto set my hand

16  this 4th day of June, 2009.

17

18

19

20

21          /s/ Lee A. Marzilli
                                    _____
22          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
23

24

25

72fe4b07-ff68-4ab0-9daf-1849027a1147